**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| PARK VILLAGE APARTMENTS TENANTS ASSOCIATION, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>MORTIMER HOWARD TRUST, *et al.*,<br><br>  Defendants. | No.  C 06-7389 SBA<br><br>**ORDER**<br><br>[Docket No. 10] |

Plaintiffs Park Village Apartments Tenants Association, York Tinkham, Mong Ha Kwong-Cheung, William Foster, Chi Ying Lee, King Ming Lee, Cecelia Nelson, Shirley Smith, and Cornelius Weekley (collectively "tenants") filed a motion for a preliminary injunction [Docket No. 10] seeking to enjoin the defendants Mortimer R. Howard and the Mortimer Howard Trust (Howard), the owners of Park Village Apartments, from raising rents or evicting the residents of Park Village.  The tenants allege that Howard failed to provide the required notice under federal and state law prior to the non-renewal of a contract with the United States Department of Housing and Urban Development (HUD).

A hearing was held on the motion on February 13, 2007.  Because the tenants have demonstrated a substantial likelihood of success on their claim that the federal notice requirements were not met and because they have also shown the possibility of irreparable harm, the Court GRANTS the motion for preliminary injunction.

## BACKGROUND

The tenants filed a complaint for declaratory and injunctive relief in the Superior Court of Alameda County on November 3, 2006.  On December 1, 2006, Howard removed the case to this Court.  Howard also removed the related case of *City of Oakland v. Mortimer Howard Trust, et al.*, 06-7390 SBA, N.D. Cal. 2006.  Unlike the *City of Oakland* case, however, the tenants are not seeking to remand this action to the Superior Court of Alameda County.

Park Village Apartments is a rental housing community for low-income senior citizens located at 3761 Park Boulevard in Oakland, California.  Mortimer R. Howard became the owner of the property

around 1976. Ownership of the property was transferred to the Mortimer Howard Trust, of which Mortimer R. Howard is the trustee, in the last several years. The property is an eight-four unit residential apartment complex housing approximately seventy-two people, and has served as subsidized housing for low-income seniors for approximately thirty years. Howard had contracted with HUD to provide low-income housing pursuant to 42 U.S.C. § 1437f, commonly referred to as "section 8." The City of Oakland issued a conditional use permit for development of the property in approximately 1978, exempting Park Village from certain density restrictions and parking allotments, and requiring the property to continue as senior housing for fifty years.

In 1999, the Housing Assistance Payments contract (H.A.P.) was renewed for five years and expired in November 2004. Between 2003 and 2004, Howard negotiated his last H.A.P. contract with HUD. In addition to entering into the H.A.P. contract, Howard entered into a separate lease, approved by HUD, with each tenant of the property. Howard Decl. at ¶ 4. On September 9th, 2004, Howard sent a letter to the tenants stating that the H.A.P. contract had been renewed for the term of November 2004 to November 2005.

On or about July 26, 2005, Howard submitted a written request to the California Affordable Housing Initiatives (CAHI) for an Operating Cost Adjustment Factor (OCAF) rent increase from $1,192 to $1,224.19, and for a two-year renewal of the existing H.A.P. contract.

On November 18, 2005, two days before the expiration of the H.A.P. contract, Howard sent a letter to the tenants "RE: One-Year Notification Letter." Ex. H to Howard Decl. The letter states "Federal Law requires that owners provide tenants with a one-year notification before the expiration of a Section 8 contract." *Id.* The letter also announced that "we intend to renew" the contract. *Id.*

As Howard did not receive a renewal contract from CAHI or HUD on or before November 20, 2005, the existing H.A.P. contract expired. Howard Decl. at ¶ 13. Following the expiration of the subsidy contract, the tenants continued to pay the same amount of rent.

Around December 1, 2005, Howard received a letter from CAHI informing him that his OCAF rent increase had been approved. Howard Decl. at ¶ 14. Howard learned that HUD had ceased making

2

subsidy payments around December 3, 2005. *Id.* at ¶ 15.

On or about December 7, 2005, Howard received a proposed renewal contract and rent schedule. *Id. at* ¶ 16. Howard responded by expressing concern that a section of the renewal contract "may obligate [him] to terms and conditions not contained in the expiring contract." Ex. C to Greif Decl. He requested information "to ascertain if any statutes on the proposed date of signing would supersede the terms of the expiring contract, and if so, [a citation of] those statutes." *Id.* CAHI informed him that it had no authority to make amendments found in the renewal contract and that requested amendments and explanations should be forward in writing to HUD. *Id.*

On February 7, 2006, Howard, through counsel, requested HUD's clarification about enacted statutes superseding the expiring contract's terms. *Id.* Specifically, Howard's counsel noted that section 5 of CAHI's proposed renewal contract might supersede the terms of the expiring contract if those terms were inconsistent with statutes in effect at the time of the H.A.P. contract renewal. *Id.*

On March 6, 2006, Howard delivered a letter to each tenant stating that the H.A.P. contract had expired the previous November and, as a result, each tenant had to give notice to vacate or pay $1,192 in rent. Ex. K to Howard Decl. Howard noted that he found a provision of the renewal contract unacceptable because "without my knowledge, changes to the previous, or expired contract, could result in increased obligations on Park Village to HUD." *Id.* A few days later Howard sent another letter to each tenant demanding an increase in rental payments by $12.00 per month to compensate for a utility allowance that he asserts would have been received from HUD had the H.A.P contract been renewed.

On March 10, 2006, HUD responded to Howard's request for clarification of the terms of the renewal contract by explaining that one major change included the "Income Targeting requirement," requiring at least forty-percent of the assisted units become available to "extremely low-income" families. Ex. D to Greif Decl. On March 17, 2006, HUD provided the following additional clarification:

1. Section 1.1g - There are no changes.
2. Section 1.7 - There are no changes in this section except for the definition of the term "Decent, Safe, and Sanitary" as provided to [Howard's counsel.]
3. Section 1.9c of Part 1 - This was previously addressed to [Howard's counsel.]

3

      4.      2.6 of Part 2 - There are no changes.
      5.      2.8 of Part 2 - There are no changes.

Ex. E to Greif Decl. HUD also indicated its awareness of the thirty-day notice sent to tenants of the property on March 6, 2006. It also insisted that Howard rescind his demand that tenants pay an additional $12 per month for utilities. Ex. E to Greif Decl.

On March 27, 2006, Howard delivered another letter to each tenant stating that the September 9, 2004 letter satisfied statutory notice requirements, or "[i]n the event that notice failed to meet the legal sufficiency required by law, . . . a 12-months notice will be deemed to have commenced on November 20, 2005, the expiration date of the HAP contract." Ex. N to Howard Decl. Howard continued that "the notice [given to the tenants on September 9, 2004] did not state or imply that it was the owner's intention to renew or not to renew the HAP contract prior to its expiration date, thereby precluding any statements in the notice relating to an owner's intention." *Id.*

On March 29, 2006, Howard corresponded with HUD and declared that "I am still willing to renew the HAP contract but on a negotiated basis. In the event that we are not able to come to some agreement, I am prepared to abandon the relationship that we have had since May of 1978." Ex. F to Greif Decl. Howard sent another letter to HUD on April 10, 2006, describing in detail what terms of the renewal contract would have to be negotiated, namely, provisions 5a, 7b, and 9. Ex. G to Greif Decl. He stated he "would not be agreeable to any HUD requirements that can or have amended" certain provisions of the expired contract, dated May 24, 1978. *Id.* Howard found that because nothing in the expired contract at 1.7 "requires that owner be subject to standards arrived at by grading to determine whether he is in compliance with the contract, owner will only respond to conditions that rise to the level of a clear breach of the contract, pursuant to 1.7c, not grading." *Id.* Further, Howard stated that section 2.6 of the expired contract "does not require the owner to submit to a standard of grading, as required by HUD's Management and Occupancy reviews and will only submit to conditions that rise to the level of breach of contract, under 2.6." *Id.*

The epistolatory exchanges continued. On April 11, 2006, HUD sent a letter to Howard stating that the March 6th letter "does not satisfy statutory notice requirements to the tenants and to HUD

4

1  regarding termination of the HAP contract" and that he was "prohibited as a matter of law . . . from
2  evicting the tenants or raising their rents as [a] consequence of any lapse in the latest HAP contract."
3  Ex. H to Greif Decl.  With respect to the March 27th letter, HUD advised Howard that "the tenant
4  payment amount on the lease is the (TTP) less the utility allowance provided by HUD" and that "the
5  utility allowance is included in the project's subsidy payment." *Id.*

6  On May 4, 2006, HUD responded to Howard's April 10th letter about the proposed revisions
7  to the renewal contract.  Ex. I to Greif Decl.  HUD declared:

> With regard to the new contract that is offered, we are unable to delete provisions 5a, 7b, and 9.
> We do not understand how provision 5a of the proposed contract invalidates provision 1.16 of the original contract.
> We do not see that the proposed contract amends provisions . . . 1.6, 1.7, 1.9, 1.10, 2.6, 2.7, and 2.8.
> We are unable to answer the comments on provisions 1.7 and 2.6 with regards to standards that rise to the level of a breach of contract not knowing what constitutes that breach of contract.

*Id.*  HUD further noted that the utility allowance was addressed previously and that tenants were not required to pay the $12 per month requested by Howard.  *Id.*

On October 23, 2006, Howard delivered to each tenant a letter entitled "90 Day Notice of the Termination of Your Lease Agreement," announcing that "you have the option of entering into a new lease agreement with the owner [by January 23rd, 2007] which will increase your rent to $1192.00 per month, the rent paid prior to the expiration of the HAP contract, or vacate your unit before January 23rd, 2007."  Ex. O to Howard Decl.

Howard received a letter from HUD informing him that HUD was "seriously concerned" about his refusal to execute the renewal contract around November 6, 2006.  Ex. P to Howard Decl.  HUD reiterated its prior offer:

> Up to this point, we have offered you a retroactive contract, which would enable you to receive subsidy payments from November 2005.  In addition, the rents would be increased from the current $1192.00 per month to $1225.00 per month.  HUD is still fully prepared to enter into a renewal contract with you, or with the trust to which you recently transferred ownership, under the same terms that we proposed in 2005.

*Id.*

5

**LEGAL STANDARDS**

Federal Rule of Civil Procedure 65 permits the issuance of a preliminary injunction, the purpose of which is to preserve the relative positions of the parties until a trial on the merits can be conducted. *See E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006); *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir. 2006). A party seeking a preliminary injunction must show either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Faith Ctr. Church Evangelistic Ministries v. Glover,* 462 F.3d 1194, 1201-02 (9th Cir. 2006). These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *LGS Architects*, 434 F.3d at 1155; *see also Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1174 (9th Cir. 2006) (the greater the relative hardship to the moving party, the less probability of success must be shown to support the grant of a preliminary injunction).

Under the sliding scale theory, a party seeking an injunction "need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993), *cert. denied*, 511 U.S. 1030 (1994). Additionally, in cases where the public interest may be affected, the court must consider the public interest as a factor in balancing the hardships. *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004).

While a preliminary injunction will not be issued without security by the applicant under Federal Rule of Civil Procedure 65(c), a district court has wide discretion in setting the amount of a bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction. *See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

**ANALYSIS**

The tenants request a preliminary injunction to maintain the status quo for the pendency of the

litigation.  The tenants seek to enjoin Howard "from: 1) demanding or collecting any amounts from any tenant at Park Village Apartments in excess of the amount that tenant was paying as of November 20, 2005, and 2) evicting any tenant at Park Village Apartments or taking any action to accomplish such an eviction, including the filing of any action for unlawful detainer."  Pl.'s Mot. for Prelim. Inj. at 7.  For the reasons below, the tenants' request for a preliminary injunction should be granted.

**A.     Likelihood of Success on the Merits**

     **1.     Federal Statutory and Regulatory Notice Provisions**

Title 42 U.S.C. § 1437f(c)(8)(A) provides:

> Not less than one year before termination of any contract under which assistance payments are received under this section . . ., an owner shall provide written notice to the Secretary and the tenants involved of the proposed termination.  The notice shall also include a statement that, if the Congress makes funds available, the owner and the Secretary may agree to a renewal of the contract, thus avoiding termination, and that in the event of termination the Department of Housing and Urban Development will provide tenant-based rental assistance to all eligible residents, enabling them to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside.  Any contract covered by this paragraph that is renewed may be renewed for a period of up to 1 year or any number or years, with payments subject to the availability of appropriations for any year.

The following subsection, 42 U.S.C. § 1437f(c)(8)(B), adds:

> In the event the owner does not provide the notice required, the owner may not evict the tenants or increase the tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed.  The Secretary may allow the owner to renew the terminating contract for a period of time sufficient to give tenants 1 year of advance notice under such terms and conditions as the Secretary may require.

In addition to the statutory notice, HUD has its own additional notice provisions.  *See* 47 U.S.C. § 1437f(c)(8)(C) ("Any notice under this paragraph shall also comply with any additional requirements established by the Secretary").  HUD specifically requires that "[t]he one-year notification must state the owner's intentions (i.e. to renew or not renew) at the time of the contract's expiration."[1]

---

[1] HUD, OFFICE OF MULTIFAMILY HOUSING, SECTION 8 RENEWAL POLICY: GUIDANCE FOR THE RENEWAL OF PROJECT-BASED SECTION 8 CONTRACTS § 11-4(A) (2005), *available at* http://www.hud.gov/offices/hsg/mfh/exp/guide/s8renew.pdf (HUD SECTION 8 RENEWAL POLICY).

Howard maintains that the statutorily required notice provisions do not apply to here because he had every intention of renewing the prior contract; it was HUD that allowed the assistance contract to expire. This argument fails because the expiration of the assistance contract falls within the definition of "termination" as defined in the federal statute. "Termination" is defined to mean "the expiration of the assistance contract or an owner's refusal to renew the assistance contract, and such term shall include termination of the contract for business reasons." 42 U.S.C. § 1437f(c)(8)(D). Thus, either of the two events constitutes "termination" and triggers federal notice requirements: (1) the expiration of the assistance contract or (2) an owner's refusal to renew. Even accepting Howard's contention that he did not refuse to renew the contract, the assistance contract still expired, and therefore there was a termination as defined by statute. It follows then that notice is required.

Moreover, Howard fundamentally misunderstands the nature of the obligation imposed by 42 U.S.C. § 1437f(c)(8)(D). Howard argues that because the H.A.P contract expired, he has no notice obligations. Howard relies upon *Whitehall Manor Properties, Inc. v. Lamothe*, 430 N.E.2d 852, 853 (Mass. App. Ct. 1982), an opinion offering quite limited factual or legal analysis. In that case the court rejected a section 8 tenant's argument that her tenancy was improperly terminated. *Id*. The court reasoned that the procedures for terminating a section 8 lease apply only when the lease is in effect. *Id*. Because the lease expired, the landlord was not required to follow those procedures. *Id*. But the notice requirement in this matter is not a contractual obligation that expired when the contract did. The notice requirement here is a statutory obligation. As long as there was "any contract under which assistance payments are received under this section," a point which is not disputed, the statute demands that a one year notice be given.

Howard acknowledges that none of the purported notices given to the tenants included a statement following the statutory language of 42 U.S.C. § 1437f(c)(8)(A). Howard argues, however, that the notice provided to tenants "substantially complied" with the federal notice requirements, relying heavily on *Owens v. Charleston Housing Authority,* 336 F. Supp. 2d 934, 940-41 (D. Mo. 2004). In *Owens*, the plaintiffs challenged the notice given by the defendant because of a failure to advise the

8

1  affected tenants that they could use their tenant-based assistance vouchers to stay in the units where they
2  resided. The court held the notice "substantially complied" with federal requirements because the
3  defendant intended to demolish the housing units and noted that "[a]lthough the notice did not follow
4  the statutory language, it would have been misleading had it strictly followed the statute." *Owens*, 336
5  F. Supp. 2d at 946. This case is inapposite. Here there is no comparable potential confusion that would
6  excuse the notice required by statute.

7  An examination of each of the purported notices shows that they fail to satisfy the statute and
8  the HUD provisions. The September 9, 2004 letter is insufficient. As noted above, HUD required that
9  the notice specifically indicate the owner's intention to renew or not to renew. Howard himself declared
10  that, "[t]he notice to the tenants did not state or imply that it was the owner's intention to renew or not
11  to renew the HAP contract prior to its expiration date, thereby precluding any statements in the notice
12  relating to an owner's intention." Ex. N to Howard Decl.

13  Likewise, the November 18, 2005 letter fails to satisfy the notice requirements. The tenants
14  correctly point out that the November 18th notice does not have the required language notifying tenants
15  of Howard's intent to opt-out of the contract. Pls.' Reply at 5 (citing Howard Decl. ¶11.) In fact, the
16  letter clearly states the opposite: "[t]his letter is to notify you that we intend to *renew* the current Section
17  8 contract when it expires." Ex. H to Howard Decl. (emphasis added).

18  Finally, Howard contends that, at the very latest, the March 6, 2006 notice to vacate within thirty
19  days or pay the full contract rent served as sufficient notice. The HUD section 8 renewal policy,
20  however, mandates that, "[i]f an owner states that they intend to renew the contract but later changes
21  their mind and decides to opt-out of the contract, they must provide tenants with a new one-year
22  notification of this change of plans. In other words, tenants must receive a one-year notification of an
23  owner's decision to opt-out."[2] In addition, the March 6, 2006 letter also does not conform to the
24  statutory notice language of 42 U.S.C. § 1437f(c)(8)(A).

---

[2]   HUD SECTION 8 RENEWAL POLICY at § 11-4(C)(4).

### 2. State Notice Requirements

The tenants also argue there was not compliance with state notice requirements as codified by California Government Code sections 65863.10(b)(1) and (c)(1). Pls.' Reply at 5-6. Howard's main argument is that state notice requirements do not apply to this case. Howard asserts that the California statutory notice provisions do not apply in this case because "[he] did not make any decision to 'not extend or not renew' [his] participation in the Section 8 project-based subsidy." Defs.' Opp'n at 8. Because the tenants have demonstrated a substantial likelihood of success on their claim that the federal notice requirements were not met, it is not necessary to at this time to determine if the state notice requirements were also not met.

## B.     Irreparable Harm

The tenants argue that they face immediate, irreparable injury if the preliminary injunction is not granted. Howard asserts the tenants' purported harms are "illusory" because HUD vouchers are available to the tenants and because the tenants fail to show "a dearth of subsidized housing in Oakland." Defs.' Opp'n at 14. Howard argues that the tenants will be able to take advantage of tenant-based section 8 vouchers. The tenants counter that mere access to the vouchers does not guarantee the ability to use them to remain in their homes. Howard has as much declared that he "does not wish to contract with the federal government *or otherwise continue to provide low-income housing.*" Howard Decl. ¶ 26 (emphasis added). From this declaration, it seems likely that Howard would not accept the tenant-based vouchers if not legally required to do so.

A number of tenants have submitted declarations that they are elderly, frail, and in ill-health.[3] In addition, most, if not all, of the tenants are on fixed incomes.[4] Finally, federal law grants the tenants a right to a given amount of notice. If that notice is not provided, it is difficult to see how the tenants

---

[3]  Pls.' Reply at 7; *see also* Exs. H, I, J, K, L, M, N, and O to Pls.' Mot. for Prelim. Inj. in State Court (Ex. D to Defs.' Notice of Removal of Tenants' Case).

[4]  Pls.' Reply at 8; *see also* Exs. H, I, J, K, L, M, N, and O to Pls.' Mot. for Prelim. Inj. in State Court.

10

can be compensated in terms of damages.

**C.     Scope of Preliminary Injunction and Bond Determination**

    **1.     Scope**

Howard argues that if the injunction is granted, it should only extend to March 6, 2007 at the latest because the tenants received notice of the owner's intention not to renew March 6, 2006. However, this notice failed to meet federal statutory notice requirements. Therefore it did not effectively "start the clock" as it were.

    **2.     Bond**

While the literal language of Federal Rule of Civil Procedure 65(c) suggests that a preliminary injunction will not be issued without security by the applicant, a district court has wide discretion in setting the amount of a bond. *See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Given that the tenants are of limited means, and have shown fairly convincingly that the federal notice requirements were not met, the Court will exercise its discretion and waive the bond requirement.

## CONCLUSION

IT IS HEREBY ORDERED THAT the Plaintiffs' Motion for Preliminary Injunction [Docket No. 10] is GRANTED. Defendants Howard Mortimer Trust and Howard R. Mortimer are enjoined from demanding or collecting rent payments in excess of the amount the tenants were paying as of November 20, 2005, and from evicting any tenant at Park Village Apartments or taking any action to accomplish such an eviction, including the filing of any action for unlawful detainer, for the duration of this action or until such time as Howard has provided the notice required by 42 U.S.C. § 1437f(c)(8)(A) and one year has elapsed.

IT IS FURTHER ORDERED THAT a case management conference is set for March 15, 2007, at 2:45 PM, via telephone. Counsel for the tenants are to set up the conference call with all the parties on the line and call chambers at (510) 637-559.

11

IT IS SO ORDERED.

February 13, 2007

*Saundra B Armstrong*
Saundra Brown Armstrong
United States District Judge